UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JILL A. WILLIAMS, | Case No. C14-0866 RSM |
| Plaintiff, | |
| v. | ORDER  DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |
| LIFE INSURANCE COMPANY OF NORTH AMERICA, a foreign Insurer, | |
| Defendant. | |

## I.    INTRODUCTION

THIS MATTER comes before the Court on the parties' Motions for Summary Judgment. Dkts. #20 and #22.  The parties seek judgments as a matter of law with respect to coverage under an Accidental Death & Dismemberment ("AD&D") policy issued by Defendant Life Insurance Company of North America's ("LINA") to Plaintiff's now-deceased husband, Michael Williams.   Having reviewed the record before it, and having considered the oral arguments presented by the parties on July 28, 2015, the Court now DENIES Plaintiff's Motion for Summary Judgment and GRANTS Defendant's Motion for Summary Judgment for the reasons discussed herein.

## II.    BACKGROUND

The sequence of events leading up to this case is undisputed.  Plaintiff's now-deceased husband, Michael Williams, was an employee of Public Utility District No. 1 of Snohomish

ORDER
PAGE - 1

County.  Mr. Williams enrolled for two types of insurance through his employer, both issued by Defendant through group policies – basic life insurance under Policy No. FLI 051202, and AD&D insurance under Policy No. OK821591 ("The Policy").  *See* Dkt. #23, Ex. A.  Plaintiff, Jill Williams, is the primary beneficiary of both policies.  Ms. Williams has received benefits under the life insurance policy, and that policy is not at issue here.  The current dispute focuses on benefits under the AD&D Policy.

Mr. Williams was a member of the UMF motorcycle club.[1]  Dkts. #20 at 3 and #23, Ex. C at 1.  On June 8, 2013, Mr. Williams and approximately 20-25 other riders gathered in Gig Harbor, WA, to ride in memoriam for a fellow UMF rider who had passed away.  *Id.*  The riders met at a bar in Gig Harbor at approximately 10:00 a.m. and stayed there for about an hour.  Dkt. #23, Ex. C at 1.  They then drove to a bar in Belfair.  *Id.*  According to Washington State Patrol Officer Adam Richardson, Mr. Williams was observed drinking several beers at the Belfair bar before being told by another UMF member to slow down because they still had more riding to do.  *Id.*  They departed Belfair at approximately 12:30 p.m.

> While traveling west on SR 106, Williams was at the front of the pack and was seen swerving by other members of the group.[2]  A group of an unknown number of sports style motorcycles came up from behind Williams' group at a high rate of speed.  All of the sports bike riders passed Williams' group with the exception of two.  Those two could not make it past the entire group before a corner and cut into Williams' group, coming very close to several other motorcyclists in the group.
>
> This upset Williams who then got into a verbal argument with one of the sports bike riders.  That rider attempted to accelerate away and Williams

---

[1]  As do the parties, this Court shall refer to this Club only by its acronym in the interest of decorum.  A review of the Club's various websites reveals the Club's full name, as well as the origins of the Club, including that its "express purpose was to take the vote away from women."  *See*, *e.g.*, http://umfworld.org/wordpress/?page_id=37, *last visited* June 24, 2015.

[2]  The witness interviews reveal that one of the UMF riders thought Mr. Williams was "playfully" swerving until he witnessed Mr. Williams nearly run into a mailbox, at which point the rider believed that Mr. Williams was impaired by alcohol.  Dkt. #23, Ex. D at 18.

ORDER
PAGE - 2

pursued him at a high rate of speed.  Williams and the other rider came to a stop in the roadway and exchanged words for several seconds before the rider of the sport bike accelerated away again.

Williams attempted to chase the other rider at a high rate of speed.

. . .

Williams was traveling westbound SR 106 near milepost 10.5 at approximately 80 mph when he attempted to negotiate a right hand curve in the roadway.  [Dorinda D.] Brown was traveling eastbound SR 106 near milepost 10.5 at or near the posted 40 mph speed limit.  Williams was unable to maintain his lane as he rounded the curve and began drifting toward the center line.

Williams braked hard causing his rear tire to skid as he was still travelling toward the oncoming lane.  Williams let up on the brake to recover from the skid and braked hard again causing a second skid as he crossed over the center line.  Brown braked and steered her vehicle to the right until her tires were to the right of the fog line and on the shoulder in an attempt to avoid the impending collision.

Williams and Brown collided head on in the eastbound lane.  The motorcycle struck the front left of the Chevrolet Volt causing significant front end damage as well as airbag deployment.  The front wheel and forks on Williams' motorcycle crushed inward toward the rear of his vehicle and peeled the hood and front left fender back on Brown's car.

Williams separated from the motorcycle and struck the lower left portion of Brown's windshield with his helmet.  Williams died on impact.  After striking the windshield, his helmet buckle broke and the helmet separated from Williams' head coming to a rest in the eastbound ditch to the west of the collision scene.  Williams' body continued through the air to the west, finally coming to rest in the center of the roadway 40 feet from the initial impact.

Dkt. #23, Ex. C at 1-2; *see also* Dkt. #21, Ex. A.  A subsequent toxicology report revealed that, at the time of the accident, Mr. Williams had a blood alcohol level of 0.17g/100mL – more than two times the legal limit.  Dkt. #23, Ex. B.

Ms. Brown received injuries to her head, neck and back, and was airlifted to Harborview Medical Center in Seattle, WA.  Dkts. #21, Ex. Ex. A and # 24 at ¶ ¶ 3 and 4.

According to Ms. Brown, she has been diagnosed with a traumatic brain injury. *Id.* at ¶ 4. As a result, she suffers from amnesia and does not recall the events leading up to the accident or the events which occurred immediately after. *Id.* at ¶ 2 and Dkt. #23, Ex. C at 2.

Forensic pathologist Emmanuel Q. Lacsina, M.D., who performed the autopsy of Mr. Williams, concluded:

> This 47 year-old white male, Michael Williams, died of multiple blunt force injuries to the head, neck, torso and lower left extremity, sustained as an operator of a motorcycle which collided with an auto. The manner of death is classified as an ACCIDENT (Traffic).

Dkt. #21, Ex. B at 1.

After the incident, Ms. Williams made claims under Mr. Williams' life insurance and AD&D policies. On July 8, 2013, Defendant approved Ms. Williams' claim under the life insurance policy. Dkt. #21, Ex. E. The Claims Specialist handling the claims noted that the claim under the AD&D policy was still under review. *Id.* On August 23, 2013, Defendant denied Ms. Williams' claim under the AD&D policy. Dkt. #21, Ex. C. Defendant provided two bases for its denial – first, that the incident was not an "accident" because of the deliberate acts by Mr. Williams preceding the collision, and therefore the incident was not a covered loss under the AD&D policy; and, second, that the incident occurred during the commission of a felony, and benefits are therefore excluded under the felony exclusion in the policy. *Id.* Ms. Williams appealed the denial, which was rejected on March 25, 2014. Dkt. #21, Ex. F. The instant lawsuit followed.

### III.   DISCUSSION

**A.  Summary Judgment Standard**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). In ruling on summary judgment, a court does not weigh evidence to determine the truth of the matter, but "only determine[s] whether there is a genuine issue for trial." *Crane v. Conoco, Inc.*, 41 F.3d 547, 549 (9th Cir. 1994) (*citing Federal Deposit Ins. Corp. v. O'Melveny & Meyers*, 969 F.2d 744, 747 (9th Cir. 1992)). Material facts are those which might affect the outcome of the suit under governing law. *Anderson,* 477 U.S. at 248. The parties appear to agree that there are no disputed material facts and that this matter is appropriate for disposition on the instant motions.

## B.  Relief Sought

Plaintiff now seeks an Order from this Court finding as a matter of law that the felony exclusion is void as a matter of public policy under Washington law, and that Mr. Williams' death was an accident within the meaning of the insurance policy. Dkt. #20. Defendant seeks judgment as a matter of law that the felony exclusion is not void, and that Mr. Williams' death was not an accident and therefore not covered by the AD&D policy. Dkt. #22.

## C.  Interpretation of Insurance Contracts

Under Washington law, "[i]nsurance policies are to be construed as contracts, and interpretation is a matter of law." *State Farm General Ins. Co. v. Emerson*, 102 Wn.2d 477, 480, 687 P.2d 1139 (1984). "The entire contract must be construed together in order to give force and effect to each clause," and be enforced "as written if the language is clear and unambiguous." *Washington Pub. Util. Districts' Utils. Sys. v. Pub. Util. Dist. No. 1 of Clallam County ("Washington Pub.")*, 112 Wn.2d 1, 10, 771 P.2d 701 (1989); *see also Transcon. Ins. Co. v. Washington Pub. Utils. Dists.' Util. Sys.*, 111 Wn.2d 452, 456 (1988) (explaining that if insurance contract language is clear and unambiguous, the court "may not modify the contract or create ambiguity where none exists"). If, on the other hand, "a policy provision on its face is

ORDER
PAGE - 5

fairly susceptible to two different but reasonable interpretations, the policy is ambiguous and the court must attempt to discern and enforce the contract as the parties intended." *Transcon. Ins. Co.*, 111 Wn.2d at 456-57; *see also Kish v. Ins. Co. of N. Am.*, 125 Wn.2d 164, 171, 883 P.2d 308 (1994).

An insurance contract "will be given a practical and reasonable interpretation that fulfills the object and purpose of the contract rather than a strained or forced construction that leads to an absurd conclusion, or that renders the contract nonsensical or ineffective." *Washington Pub.*, 112 Wn.2 at 11; *see also Transcon. Ins. Co.*, 111 Wn.2d at 457. Further, insurance contracts are interpreted "as an average insurance purchaser would understand them and give undefined terms in these contracts their 'plain, ordinary, and popular' meaning." *Kish*, 125 Wn.2d at 170 (quoting *Boeing Co. v. Aetna Cas. & Sur. Co.*, 113 Wn.2d 869, 877, 784 P.2d 507 (1990)); *see also Emerson*, 102 Wn.2d at 480 (stating that an insurance contract should be interpreted "according to the way it would be understood by the average insurance purchaser"). If, after attempting to discern the parties' intent, the insurance contract language remains ambiguous, "the court will apply a meaning and construction most favorable to the insured, even though the insurer may have intended another meaning." *Transcon. Ins. Co.*, 111 Wn.2d at 457; *see also Washington Pub.*, 112 Wn.2d at 10-11.

The determination of coverage under an insurance contract "is a two-step process." *Diamaco, Inc. v. Aetna Cas. & Sur. Co.*, 97 Wn. App. 335, 337, 983 P.2d 707 (1999). "The insured must first establish that the loss falls within the 'scope of the policy's insured losses.'" *Id.* (quoting *Schwindt v. Underwriters at Lloyd's of London*, 81 Wn. App. 293, 298, 914 P.2d 119 (1996)). "Then, to avoid responsibility for the loss, the insurer must show that the loss is excluded by specific language in the policy." *Id.*; *see also Pub. Employees Mut. Ins. Co. v.*

*Rash*, 48 Wn. App. 701, 703, 740 P.2d 370 (1987) ("[W]hen an insured establishes a prima facie case giving rise to coverage under the provisions of his policy, the burden is then upon the insurer to prove that the loss is not covered because of an exclusionary provision in the policy."). While an exclusionary clause is "strictly construed against the insurer," its meaning "must be determined in view of the policy as a whole." *Allstate Ins. Co. v. Calkins*, 58 Wn. App. 399, 402, 793 P.2d 452 (1990) (citing *Rodriguez v. Williams*, 107 Wn.2d 381, 384, 729 P.2d 627 (1986)); *Hecker*, 43 Wn. App. at 824 (citing *Shotwell v. Transamerica Title Ins. Co.*, 91 Wn.2d 161, 166, 588 P.2d 208 (1978)).

### 1. Coverage for Accidents

The AD&D Policy at issue in this matter pays benefits for a death caused by an "accident." Dkts. #21, Ex. D and #23, Ex. A. The term "accident" is not defined in the policy. *Id.* Defendant denied coverage for Mr. Williams' collision on the basis that the collision was not an accident because of Mr. Williams' deliberate actions before the collision occurred. Dkt. #21, Exs. C and F. Plaintiff asks the Court to find coverage as a matter of law, arguing that the collision was neither expected nor intended and therefore falls within the common meaning of the word "accident," which should apply when the term has not been defined. Dkt. #20 at 15-22. Defendant argues that the "means" as well as the "result" must be unforeseen, involuntary, and unexpected, and Plaintiff cannot demonstrate that the "means" or the "result" meet that standard. Dkt. #22 at 5-8.

The Washington Supreme Court has long held that where the term "accident" is not defined in the insurance policy, courts look to the common law for definition of the term. *Lloyd v. First Farwest Life Ins. Co.*, 54 Wn. App. 299, 302, 773 P.2d 426 (1989). Importantly, Washington courts have found:

> . . . [A]n accident is never present when a deliberate act is performed unless some additional unexpected, independent and unforeseen happening occurs which produces or brings about the result of injury or death.

*Id.* (citations omitted).   Washington courts have also explained the importance of proving accidental means and accidental results:

> It is not necessary that the claimant intend or expect the injurious consequences of her actions. *Unigard*, at 263 (fire in school garbage can resulting in building blaze); *Safeco Ins. Co. of Am. v. Dotts*, 38 Wn. App. 382, 385-86, 685 P.2d 632 (1984) (backhand slap resulting in death). All that is required is that the claimant know or should know facts from which a prudent person would conclude that the injurious consequences are reasonably foreseeable. *Unigard*. Otherwise, an insured could shift intentionally inflicted injuries to an insurer in violation of public policy. *Detweiler*, at 105-06; *Unigard,* at 265; *Dotts,* at 386.

> Under the common law distinction between accidental results and accidental means, summary judgment is proper when the evidence establishes as a matter of law that the claimant's injury is (1) a "natural consequence" of deliberate conduct, and (2) not the product of an unusual or atypical intervening event. *See Detweiler*, at 108.

*Id.* at 302-03.

However, Washington courts have used multiple definitions for the term "accident" depending on the situation the case presents.   In *State Farm Fire & Cas. Co. v. Ham & Rye, L.L.C.*, 142 Wn. App. 6, 174 P.3d 1175 (2007), the Washington Court of Appeals noted that the:

> ends/means rule does not exclude all intentional acts from the definition of "accident"; rather, the definition equates "intentional" with "deliberate." *Nationwide Mut. Ins. Co. v. Hayles, Inc.*, 136 Wn. App. 531, 537, 150 P.3d 589 (2007) (citing *Roller*, 115 Wn.2d at 683).   "By use of the term 'intentional,' however, *Roller* does not mean that an accident must be caused by an unconscious, nonvolitional act.   To prove that an intentional act was not an accident, the insurer must show that it was deliberate, meaning done with awareness of the implications or consequences." *Hayles*, 136 Wn. App. at 538 (citing *Detweiler*, 110 Wn.2d at 104).   The court concluded that the insured's act of turning on an irrigation system, although intentional, was not deliberate because no reasonable mind could conclude that, under the circumstances, he should have anticipated that

ORDER
PAGE - 8

turning on the water would rot the onion crop being irrigated. *Hayles*, 136 Wn. App. at 539.

The Supreme Court has applied the reasonably foreseeable result test in two intentional shooting cases. In *Detweiler*, the insured jumped onto the back of his truck when another man started to drive it away. *Detweiler*, 110 Wn.2d at 101. When the insured fell off the truck, he fired several shots at the wheel, intending to stop it; the bullets fragmented when they hit the truck, injuring the insured. *Detweiler*, 110 Wn.2d at 101. The court held that even though the insured intended to shoot at the truck, given the confusion of the incident, including the rapidly moving truck and shooter, reasonable minds could disagree as to whether he should have expected or foreseen the injuries. *Detweiler*, 110 Wn.2d at 108. Thus, the court remanded for a jury trial on the issue of whether the resulting injury was foreseeable. *Detweiler*, 110 Wn.2d at 108-09.

In *Butler*, the insured fired a gun at a truck carrying young men he believed had destroyed his mailbox. *Butler*, 118 Wn.2d at 386-87. A ricocheting bullet injured one of the men. *Butler*, 118 Wn.2d at 401. The court held that no reasonable person could conclude that the insured, who had firearms training, was unaware of the possibility of ricochet, or that a ricochet might hit an occupant of the truck. *Butler*, 118 Wn.2d at 401. Accordingly, as a matter of law, the incident was not a covered accident. *Butler*, 118 Wn.2d at 401.

Thus, where the insured acts intentionally but claims that the result was unintended, the incident is not an accident if the insured knew or should have known facts from which a prudent person would have concluded that the harm was reasonably foreseeable. *State Farm Fire & Cas. Co. v. Parrella*, 134 Wn. App. 536, 540, 141 P.3d 643 (2006) (citing *Lloyd*, 54 Wn. App. at 302), *review denied*, 160 Wn.2d 1009 (2007).

*Ham & Rye*, 142 Wn. App. at 16-17.

Defendant argues that Mr. Williams' death was the foreseeable result of his deliberate actions. Specifically, they point to his deliberate decision to operate his motorcycle after drinking large amounts of alcohol, and the decision to operate his motorcycle at high rates of speed to chase down another motorcyclist. They also point to the fact that, at one point before the collision, Mr. Williams had stopped in the lane of oncoming traffic to argue with the other motorcyclist, which caused a truck to stop and wait for him to move into the correct traffic

ORDER
PAGE - 9

lane.  Dkt. #23, Ex. D at 18.  Defendant argues that any reasonable person would conclude that Mr. Williams knew or should have known that he could lose control of his vehicle and cause an accident.

The Court agrees with Defendant.  Mr. Williams was driving on a road that required him to negotiate turns.  He deliberately chose to drive twice the posted speed limit, after having consumed a significant amount of alcohol, with knowledge that he would need to navigate the road, including negotiating turns.  He also knew, having already stopped oncoming traffic once because of his argument with the other motorcyclist, that there was traffic in the opposite, oncoming lane.  Under these circumstances, any reasonable person would conclude that Mr. Williams knew or should have known that by driving under the influence at high rates of speed he could lose control of his vehicle and cause an accident.

Plaintiff focuses on whether Mr. Williams intended to collide with a car, resulting in his own death.  Dkts. #20 at 15-22 and #25 at 8-13.  She argues that following the logic of Defendant, all coverage for accidents would be nullified, and is contrary to Washington case law.  *Id.*  The Court is not persuaded.  First, Plaintiff fails to prove, or even discuss, both accidental means and accidental results.  *See Johnson v. Bus. Men's Assur. Co. of America*, 38 Wn.2d 245, 249, 228 P.2d 760 (1951) ("The rule is now firmly established in this state that, in order to recover under a policy insuring against death or injury by accidental means, (1) it is not enough that the *result* was unusual, unexpected or unforeseen, but it must appear that the *means* were accidental; and (2) accident is never present when a deliberate act is performed, unless some additional, unexpected, independent, and unforeseen happening occurs which produces or brings about the result of injury or death." ).  Second, whether Mr. Williams intended or expected the result is not relevant.  The term "accident" is not subjective in nature.  *Roller v.*

ORDER
PAGE - 10

*Stonewall Ins. Co.*, 115 Wn.2d 679, 685, 801 P.2d 207 (1990). "Thus, the perspective of the insured is not a relevant inquiry." *Id.*

These conclusions are in accord with other federal courts examining nearly identical circumstances. In *Gaddy v. Hartford Life Ins. Co.*, 218 F. Supp.2d 1123 (E.D. Mo. 2002), the Court reached the same conclusion:

> The facts in this case are largely undisputed[.] June 27, 1998 was a clear, dry, sunny day in Pulaski County, Missouri. At 5:35pm Charles R. Gaddy ("Gaddy") was on his way home from the grocery store, driving his white 1996 Ford Taurus, Southbound, along a curved section of Missouri Highway 28. Gaddy took the curve at 50 miles per hour, and lost control of his vehicle; running off the roadway and onto the soft gravel shoulder. Gaddy then overcorrected his steering, returned to the roadway, and crossed the center line. His car collided with a second vehicle in the Northbound lane. The crash severely damaged both vehicles, and both drivers were pronounced dead at the scene less than one hour after impact.

> Given the circumstances of the collision, and pursuant to § 43.250 R.S.Mo., the Missouri Highway Patrol conducted a technical accident investigation with the assistance of the Pulaski County Sheriff's Department and the Dixon Fire Department. As part of the investigation, blood drawn from decedent Gaddy was tested by the Missouri State Highway Patrol Crime Laboratory, which determined his blood alcohol content to be 0.21%. Defendant's Exhibit D. A report of the investigation was made by Sgt. G.L. Borlinghaus of the Missouri Highway Patrol. Defendant's Exhibit I at HAR-0113. In his report Sgt. Borlinghaus determined that Gaddy's intoxication caused the crash. Defendant's Id. at HAR-0119.

> At the time of his death, decedent Gaddy maintained a checking account at State Bank of Dixon, which is now known as Mid-America Bank & Trust Company ("Bank"). Plaintiffs' Exhibits 3 and 4. The Bank provided the names and addresses of its depositors to Hartford Life Insurance Company ("Hartford") which in turn solicited customers to purchase accident and dismemberment insurance under its Accidental Death & Dismemberment Policy No. ADD-5461 ("Policy"). Plaintiffs' Exhibit 2. The Policy offered $2,000.00 of free coverage to any enrolled Bank depositor, and offered additional coverage paid for by premiums deducted from the insured's checking account. Plaintiffs' Exhibit 3. Gaddy completed an enrollment form, selecting an additional $60,000 in coverage. Plaintiffs' Exhibit 3. Premiums for the Policy were deducted from Gaddy's checking account monthly. Plaintiffs' Exhibit 4. The Policy was in effect at the time of Gaddy's death. Defendant's Undisputed Material Facts P 5.

ORDER
PAGE - 11

After Gaddy's death, Plaintiffs submitted a claim to Defendant for the proceeds of the Policy.  Defendant refused to pay the proceeds of the Policy on the grounds that Gaddy's death did not meet the conditions of the Policy in that it was proximately caused by Gaddy's driving while intoxicated. Defendant argues that this is not an accidental cause of death under Missouri law, and that even if it was, an exclusion in the Policy bars coverage in this case.  In addition to contesting the Defendant's argument that decedent Gaddy was driving while intoxicated, Plaintiffs have argued at length against the validity of an alleged amendment by rider to the Policy which includes an exclusion for injury sustained while legally intoxicated from the use of alcohol while operating a motor vehicle.  Defendant's Exhibit B.

. . .

The parties agree that Missouri law governs this case.  In Missouri, a putative beneficiary claiming benefits under an accidental death policy must prove that the insured died by accident as a condition precedent to the insurer's duty to pay.  *State Farm Mut. Auto. Ins. Co. v. Underwood*, 377 S.W.2d 459, 462 (Mo. 1964) (citing *Caldwell v. Travelers Ins. Co.*, 305 Mo. 619, 267 S.W. 907, 921 (Mo. 1924)).  Where, as here, the uncontroverted evidence shows that the cause of death is driving while intoxicated, the issue is whether an insured who drives while intoxicated, and subsequently dies in an automobile crash caused by his voluntary intoxication, died by accident.

. . .

Missouri courts have long held that although an injury may be unusual or unexpected, it is not the result of an accident if the means causing the injury has been employed by the insured in the usual and expected way. *Applebury v. John Hancock Mut. Life Ins. Co.*, 379 S.W.2d 867, 870 (Mo. App. 1964) (insured's death proximately caused by excessive speed while fleeing police not accidental) (*citing Caldwell v. Travelers Ins. Co.*, 305 Mo. 619, 267 S.W. 907, 921 (Mo. 1924) (insured's death from surgical operation not an accidental death)).  It is well settled under Missouri law that death from bodily injury is accidental only if it is unforeseeable and unexpected.  *Cappo v. Allstate Life Ins. Co.*, 809 S.W.2d 131, 134 (Mo. App. W.D. 1991)(death a reasonably foreseeable consequence of meeting with known murderers). *Piva v. General Am. Life Ins. Co.*, 647 S.W.2d 866, 875 (Mo. App. W.D. 1983); *see also Stogsdill v. General Am. Life Ins. Co.*, 541 S.W.2d 696, 699 (Mo. App.1976); *Murphy v. Western & Southern Life Ins. Co.*, 262 S.W.2d 340, 342-43 (Mo. App. 1953) (intentional consumption of medication resulting in unintentional overdose is not accidental cause of death).

Thus, where the insured's death results, even unexpectedly, from an affirmative choice by the insured to expose himself to a known peril which reasonable and ordinary prudence would deem dangerous, recovery will be denied. *Applebury*, 379 S.W.2d at 871.  The standard is an objective one, not what the insured himself understood or believed, but what a reasonable person ordinarily would expect by such conduct. *Herbst v. J.C. Penney Ins. Co.*, 679 S.W.2d 381, 383 (Mo. App. 1984). Analytically, Missouri courts trace the chain of causation back to the last intentional act of the insured.  If the resulting bodily injury was a probable and natural consequence of that intentional act, the resulting injury was not an accident, and recovery is properly denied. *Cappo supra*; *Herbst supra*; *Stogsdill supra*; *Applebury supra*; *Murphy supra*.

In the instant case, decedent Gaddy voluntarily decided to operate his motor vehicle on a public roadway while intoxicated.  A reasonable person of ordinary prudence is presumed to know that driving while intoxicated presents a serious risk of death or serious bodily harm.  [A] death that occurs as a result of driving while intoxicated, although perhaps unintentional, is not an 'accident' because that result is reasonably foreseeable. *Cozzie v. Metropolitan Life Ins. Co.*, 140 F.3d 1104, 1110 (7th Cir.1998).  All drivers know, or should know, the dire consequences of drunk driving.  Thus, the fatal result … should surprise no reasonable person. *Nelson v. Sun Life Assur. Co. of Canada*, 962 F. Supp. 1010, 1012 (W.D. Mich.,1997).

This position is in accord with the majority of federal courts. *See e.g. Baker v. Provident Life & Acc. Ins. Co.*, 171 F.3d 939 (4th Cir. 1999); *Walker v. Metropolitan Life Ins. Co.*, 24 F. Supp.2d 775, 782 (E.D. Mich. 1997); *Schultz v. Metropolitan Life Ins. Co.*, 994 F. Supp. 1419, 1422 (M.D. Fla.1997); *Miller v. Auto-Alliance Int'l, Inc.*, 953 F. Supp. 172, 176 (E.D.Mich.1997); *but see American Family Life Assurance Co. v. Bilyeu*, 921 F.2d 87, 89 (6th Cir. 1990).

*Gaddy*, 218 F. Supp.2d at 1125-28 (footnotes omitted).

For all of these reasons, the Court finds that Mr. Williams' collision was not a covered accident under the AD&D policy and Defendant reasonably denied benefits on that basis.

   2.   *Felony Exclusion*

However, even if Mr. Williams' collision had constituted an accident, Defendant reasonably excluded coverage under its felony exclusion.  The AD&D policy states that "no benefits will be paid for loss resulting from . . . (5) commission of a felony by the insured."

ORDER
PAGE - 13

Dkt. #23, Ex. A.   Defendant concluded that Mr. Williams had committed the felony of vehicular assault and denied Plaintiff benefits on that basis.  Dkt. #21, Exs. C and E.  Plaintiff argues that Defendant's felony exclusion is void as a matter of public policy and therefore cannot be enforced.

As an initial matter, Washington law classifies vehicular assault as a Class B felony. RCW 46.61.522(1)(c)(2).   A person commits vehicular assault if he or she operates a motor vehicle while under the influence of intoxicating substances and causes substantial bodily harm to another.   RCW 46.61.522(3).   "'Substantial bodily harm' means bodily injury which involves a temporary but substantial disfigurement, or which causes a temporary but substantial loss or impairment of the function of any bodily part or organ, or which causes a fracture of any bodily part." RCW 46.61.522(3) (referencing 9A.04.110).  In the instant matter, these elements are present.  At the time of his autopsy, Mr. Williams' blood alcohol content was nearly twice the legal limit.  Dkt. #23, Ex. B.  Ms. Brown suffered substantial bodily harm as a result.  Dkt. #24.  Further, the fact that Mr. Williams was never charged with or convicted of a felony is of no import.  *Allstate Ins. Co. v. Raynor*, 93 Wn. App. 484, 496, 969 P.2d 510, 516 (1999) (holding that "neither a criminal charge nor a conviction is prerequisite to operation of the policy's exclusion of coverage for criminal acts.").  Thus, the Court finds that if the exclusion is not void for public policy reasons, it will operate to exclude benefits to Plaintiff.

Plaintiff relies on the Washington Supreme Court case, *Mendoza v. Ribera-Chavez*, 140 Wn.2d 659, 662, 999 P.2d 29 (2000), in support of her argument that the felony exclusion is void as a matter of law.  In *Mendoza*, the Washington Supreme Court stated:

> We are asked whether a clause in an automobile insurance policy which
> excludes coverage for use of the vehicle "in the commission of any felony"
> is ambiguous or void as against public policy.  We hold, following *Mutual
> of Enumclaw Ins. Co. v. Wiscomb*, 97 Wn.2d 203, 643 P.2d 441 (1982), the

ORDER
PAGE - 14

> clause is void as against public policy.  Accordingly, we affirm the Court of
> Appeals and remand.

*Mendoza*, 140 Wn.2d at 660-61.

The underlying facts of the *Mendoza* case are similar to those here.  Eliza and Jose Mendoza were seriously injured when their Nissan pickup was in a head-on collision with a Subaru station wagon that had crossed the center line of the road. One of the passengers in the Subaru died as a result of the accident.  The Subaru driver, Ramiro Rivera-Chavez, admitted he was intoxicated at the time of the accident and pleaded guilty to one count each of vehicular assault and vehicular homicide, both felonies.  *Id.* at 661.  One of Mr. Rivera-Chavez's insurers later brought a declaratory judgment action seeking a declaration that it did not owe benefits to the Mendozas under the felony exclusion in its policy.  *Id.*

In determining that the felony exclusion was void as a matter of public policy, the Washington Supreme Court found that the exclusion was "broad enough to encompass felonies (such as vehicular homicide and vehicular assault) which depend on the extent of injury to the victim of the accident rather than the risk to the insurer," and was therefore void as a matter of public policy.  *Mendoza*, 140 Wn.2d at 662.  Defendant argues, and this Court agrees, that the same reasoning does not apply in the instant case.

Important to the *Mendoza* case is both the context in which the matter arose – via a claim by a third-party beneficiary – and the context of the insurance itself – automobile insurance coverage rather than AD&D coverage.  In *Mendoza*, the Court explained:

> "Public policy" is a nebulous term and on the whole, courts are reluctant to
> hold that a clause in an insurance policy is in violation of public policy.
> *Boeing Co. v. Aetna Cas. & Sur. Co*., 113 Wn.2d 869, 876 n.1, 784 P.2d
> 507, 87 A.L.R.4th 405 (1990). In order to give more meaning to the term, it
> has been held that a contract will not violate public policy unless it is
> "'prohibited by statute, condemned by judicial decision, or contrary to the
> public morals.'"  *State Farm Gen. Ins. Co. v. Emerson*, 102 Wn.2d 477,

ORDER
PAGE - 15

481, 687 P.2d 1139 (1984) (quoting 17 C.J.S. *Contracts* § 211, at 1024 (1963)).

> This court has been careful to look to a particular statute to guide it in defining public policy.  We will not make public policy from whole cloth.  For example, although the courts have found relevant statutes in the area of motor vehicle insurance (the financial responsibility act (FRA) (chapter 46.29 RCW) and the underinsured motorist statute (RCW 48.22.030)), they have failed to find similar statutes relating to homeowners' insurance.  As a result, "family members" exclusion clauses which have been held to violate public policy based on the FRA with respect to automobile insurance (*Wiscomb*, 97 Wn.2d 203) have been held not to violate public policy in the context of homeowners insurance (*Emerson*, 102 Wn.2d 477; *see also Cary v. Allstate Ins. Co*., 78 Wn. App. 434, 897 P.2d 409 (1995),*aff'd,*130 Wn.2d 335, 922 P.2d 1335 (1996)).

> In the present case, the relevant statutes for determining public policy are the FRA and the mandatory liability insurance act (chapter 46.30 RCW).

*Id.* at 662-63.  The Court went on to explain that the Washington courts had recognized the strong public policy behind the statues, which is aimed at protecting the public from motorists who are unable to compensate the victims of accidents.  *Id.* at 663 and 669.  As a result, the Court found the exclusion void for public policy because it resulted in a retrospective determination of risk to the insurer and was linked not to the insurer's risk, but to the victim's injuries.  *Mendoza*, 140 Wn.2d at 668-72.

This rationale does not apply to the instant case, where a first party beneficiary is seeking benefits under an AD&D policy.  First, it is significant that AD&D policies are not the same as auto policies.  They are not intended to compensate third-parties who have been injured, and they are not subject to the FRA or mandatory insurance statutes.  This is important because, as the Washington Supreme Court noted in *Mendoza*, the court will not make public policy from whole cloth.  The courts must look to the public policy behind relevant statutes, which do not always operate in the same manner or apply to similar exclusions in different insurance contexts.  *Mendoza*, 140 Wn.2d at 662-63.  The public policy concerns discussed in

*Mendoza* do not apply to AD&D policies. The denial of benefits does not leave innocent, third-party victims of the insured without recourse. Instead, the exclusion works to deny coverage to an Insured whose own felonious conduct results in his or her own injury. The Court agrees with Defendant that this is consistent with the public policy of not insuring criminal acts. *See Queen City Farms, Inc. v. Central Nat'l Ins. Co.*, 64 Wn. App. 838, 862 fn. 15, 827 P.2d 1024 (1992).

This public policy rationale is consistent with that discussed in other types of Washington cases. For example, in *Estate of Kelly v. Falin*, 127 Wn.2d 31, 34, 896 P.2d 1245, 1246 (1995), the Washington Supreme Court examined whether a commercial establishment is liable for injuries sustained by an obviously intoxicated patron. The Court discussed public policy reasons for allowing third-party recovery in drunk driving actions, and why such policy did not apply to the intoxicated person himself or herself. The court noted:

> It belies common sense, however, to suggest that RCW 66.44.200, which proscribes selling alcohol to intoxicated adults, was intended to shield the drunk driver from responsibility for his or her own actions. Indeed, RCW 66.44.200 was enacted to "[protect] the welfare, health, peace, morals, and safety of the people of the state". RCW 66.08.010. The Patrons offer no evidence that the Legislature intended RCW 66.44.200 to protect the drunk driver. Statutes should be construed to effect their purpose, and avoid unlikely "absurd or strained consequences". *Wright v. Engum*, 124 Wn.2d 343, 351, 878 P.2d 1198 (1994) (quoting *In re Eaton*, 110 Wn.2d 892, 901, 757 P.2d 961 (1988)). Without a more precise directive from the Legislature, it would be utterly fatuous to interpret RCW 66.44.200 as protecting the drunk driver. Adults are expected to temper their alcohol consumption or simply refrain from driving when intoxicated. Unlike an innocent bystander hit by a drunk driver or a youth whose sense of immortality leads to reckless abandon, the responsibility for self-inflicted injuries lies with the intoxicated adult. Until the Legislature indicates otherwise, this court will not absolve intoxicated adults of their accountability for such accidents.
> . . .
>
> . . . As a matter of public policy, we have premised the duty of commercial vendors on the need to protect *innocent bystanders* from intoxicated

patrons, *Christen v. Lee*, 113 Wn.2d 479, 497, 780 P.2d 1307 (1989) (citing *Shelby v. Keck*, 85 Wn.2d 911, 914, 541 P.2d 365 (1975); *Waldron v. Hammond*, 71 Wn.2d 361, 363, 428 P.2d 589 (1967)), and on the need to protect *minors*.   *Purchase v. Meyer*, 108 Wn.2d 220, 737 P.2d 661 (1987); *Young v. Caravan Corp.*, 99 Wn.2d 655, 663 P.2d 834, 672 P.2d 1267, *modified*, 672 P.2d 1267(1983).   These public policy concerns are not present when intoxicated adults injure themselves.

A rule that allows an intoxicated adult to hold a commercial vendor liable fosters irresponsibility and rewards drunk driving.   Rather than deterring drunk driving, excessive drinking, and the callow and imprudent behavior of intoxicated adults, such a rule would actually compensate patrons who drink beyond obvious intoxication.   As the Ohio Supreme Court explained in rejecting recovery by an intoxicated patron even though Ohio allows third party recovery:

> [A]n adult who is permitted to drink alcohol must be the one who is primarily responsible for his or her own behavior and resulting voluntary actions.   Clearly, permitting the intoxicated patron a cause of action in this context would simply send the wrong message to all our citizens, because such a message would essentially state that a patron who has purchased alcoholic beverages from a permit holder may drink such alcohol with unbridled, unfettered impunity and with full knowledge that the permit holder will be ultimately responsible for any harm caused by the patron's intoxication.   In our opinion, such a message should never be countenanced by this court.

*Smith v. The 10th Inning, Inc.*, 49 Ohio St. 3d 289, 291-92, 551 N.E.2d 1296 (1990).   Given a choice between a rule that fosters individual responsibility and one that forsakes personal accountability, we opt for personal agency over dependency and embrace individual autonomy over paternalism.

> [A]s a matter of public policy drunken persons who harm themselves are responsible for their condition, and should not prevail either under a common law or statutory basis.

(Citations omitted.) *Ohio Cas. Ins. Co. v. Todd*, 813 P.2d 508, 511 (Okla. 1991) (recognizing that a majority of jurisdictions have rejected finding commercial vendors have a duty to intoxicated patrons under common law).

*Estate of Kelly*, 127 Wn.2d at 39-42 (emphasis in original).

ORDER
PAGE - 18

For the same reason, Plaintiff's argument that she is an innocent victim like the Mendozas is unavailing.  As the beneficiary of the Policy, she is standing in the shoes of the Insured who is entitled (or not entitled) to any benefits.  Indeed, it is by virtue of being the beneficiary that Plaintiff also maintains a right to sue for bad faith and breach of contract.  *See Gould v. Mutual Life Insur. Co. of N.Y.*, 37 Wash.App. 756, 759, 683 P.2d 207, 208 (App. 1984) (holding that beneficiary of a life insurance policy had cause of action for bad faith against insurer under the Washington Consumer Protection Act), *overruled on other grounds Haberman v. Washington Public Power Supply Sys.*, 109 Wash 107, 109 Wn.2d 107 (1987); *see also Bryant v. Country Life Insur. Co.*, 414 F. Supp.2d 981 (W.D. Wash. 2006) (recognizing that beneficiary of a life insurance policy was owed a direct contractual obligation by the insurance company and could sue under the policy to enforce that obligation).

The Court also does not find the same concerns present with respect to a retroactive assessment of risk.  The Court agrees with Defendant that the exclusion is not intended to insure against the risk that the Insured will engage in a felony, but rather ensures that the criminal behavior of the Insured will not be rewarded.  *See* Dkt. #27 at 8.

As a result, the Court does not agree with Plaintiff that it is bound by the Washington Supreme Court's ruling in *Mendoza*, *supra*, and finds that the felony exclusion in this context does not violate Washington public policy examined therein.  Since Plaintiff has not identified any other public policy contravened by the exclusion, the Court does not find it void.  Accordingly, Defendant reasonably denied Plaintiff benefits under the exclusion.

///

///

///

ORDER
PAGE - 19

**D. Plaintiff's IFCA Claim**

Because the Court has determined that Defendant reasonably denied benefits to Plaintiff, her claim under the Insurance Fair Conduct Act ("IFCA") is moot and shall be dismissed.

## IV.    CONCLUSION

Having reviewed the parties' motions for summary judgment, the responses thereto and replies in support thereof, along with all supporting declarations and exhibits and the remainder of the record, the Court hereby finds and ORDERS:

1.  Plaintiff's Motion for Summary Judgment (Dkt. #20) is DENIED.

2.  Defendant's Motion for Summary Judgment (Dkt. #22) is GRANTED.

3.  Plaintiff's claims are DISMISSED in their entirety for the reasons discussed above.

4.  This matter is now CLOSED.

DATED this 30th day of July 2015.


RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE

ORDER
PAGE - 20